Judge v. Reese and Segraves.

JUDGE and others *vs.* REESE and SEGRAVES.

1. A deed absolute in terms, but intended merely as a security for a debt, is a mortgage.

2. Bill by judgment creditors, who were the purchasers at a sheriff's sale under the execution issued on their judgment, of their debtor's real estate, for a release of the property from a former grantee of the debtor, on the ground that the grantee's deed was intended as a mortgage only, and has been satisfied, or for a decree to such effect:—*Held*, the creditors were entitled to a conveyance of so much of the property as had not been conveyed to bona fide purchasers, upon payment of any balance due on the mortgage.

On final hearing, on pleadings and proofs.

*Mr. J. F. Dumont* and *Mr. Shipman*, for complainants.

*Mr. Vanatta,* for defendants.

THE CHANCELLOR.

The complainants are judgment creditors of the defendant, Charles Segraves. They recovered their judgment in the Court of Common Pleas of Warren county, February 27th, 1858, for $826.53, besides costs. The judgment debtor, by deed dated January 14th, 1857, conveyed to the defendant,

Thomas Reese, his father-in-law, the premises in dispute in this cause, a tract of land improved for a cemetery in Phillipsburg, in this state, and known as the Phillipsburg Cemetery. The consideration expressed in the deed is $900. Amos W. Cramer, on the 8th day of March, 1869, recovered a judgment in the Circuit Court of Warren county, against Segraves, for $277.75, damages and costs. Under writs of *fieri facias de bonis et terris*, issued on these judgments, the sheriff of Warren county, on the 9th of April, 1864, sold the above mentioned property to the complainants, to whom he conveyed it by deed dated April 16th, 1864. The complainants insist that the deed from Segraves to Thomas Reese, though absolute in terms, was intended as a mortgage merely. They claim that the debt has been paid off from the sales of burial places on the premises, and that they are entitled to a release of the premises, or to a decree that the instrument is a mortgage, and has been satisfied, and that it therefore be canceled accordingly.

That there was a debt due from Segraves to his father-in-law when the deed was made, sufficiently appears. On the 9th of January, 1857, the former executed to the latter a bond and warrant of attorney, to confess judgment thereon for a debt of $870.33. This sum appears to have been composed of the following items: The amount due on a promissory note given by Segraves to Thomas Reese, dated September 3d, 1855, and payable one day after date, for $201.82, due from the former to the latter, for rent and the price of eighty bushels of oats; the amount due on a note dated February 28th, 1854, payable four months after date, of which $100 had been paid, given by Segraves to Jacob C. Reese, and by him endorsed to Lewis C. Reese, and taken up by Thomas Reese, who was bound as security for Segraves for its payment; the amount due on a note given by Reuben Tettamore, Charles Skillman, Segraves, and Thomas Reese, to Elizabeth Stryker, November 9th, 1855, payable on the 1st day of April, 1866, for $100, with interest, on which Thomas Reese claims to have been

security merely, for Segraves, and on Segraves' agreement to indemnify him, which note Thomas Reese had taken up ; and $470.64, rent due from Segraves to Thomas Reese for real estate of the latter, occupied by the former. That Thomas Reese was desirous of securing this debt is manifest from his answer, in which he gives as his reason for desiring an arrangement for the settlement of his claims against Segraves, that the latter had become careless and negligent in his business. That it was contemplated that Reese would proceed to enforce payment under the bond and warrant, is also evident from the answer. It appears, too, that at or about the time of making the deed to Thomas Reese, Segraves was disposing of all his property, and actually did dispose of it. It is a fact, also, that he did not, from inability or otherwise, pay debts of considerable amount then due from him to these complainants and others. But five days intervened between the execution of the bond and warrant of attorney and the delivery of the deed. Segraves and his father-in-law lived in the same house. The former was in debt, was pursuing a course of prodigality, and from these causes was in pecuniary difficulty. His father-in law sought to save his claim against him, and obtained the means of entering judgment against him ; and that he intended to avail himself of them is evident, also, from the fact that the affidavit required in entering up judgment on the bond and warrant, which was prepared for him by his son, is dated on the same day as those instruments.

The judgment, however, was not entered. Segraves says his father-in-law proposed to him that he should give him a deed for the property to secure his debt, to the end that he might hold it till he got his money out of it ; his father-in-law suggesting that that would prevent his creditors from getting the property away from him. The deed was given, and it is evident, that at the time it was executed there was presented to Thomas Reese, for his signature, an instrument of writing, which Segraves desired that he should execute. It is, in form, an agreement to reconvey the premises on or

before April 1st, 1861, to Segraves, on the repayment of $900 and interest, with a further agreement, that on payment of $450, Segraves might enter into and upon the premises, and take the rents, issues, and profits thereof, to his own use. The testimony satisfies me that this paper was so presented for signature to Thomas Reese when the deed was executed. His own testimony establishes this fact. Though in his answer he denies that any application was ever made to him by Segraves to sign such an agreement, or that any reference thereto was ever made by Segraves in his presence and hearing, he admits, in his testimony, that he found a paper in the deed afterwards, but says he did not know how it came there. In answer to the question, "what papers did you find in the deed afterwards, that you say you did not know how they came there?" he said: "Why, there was a little paper drawn up, of agreement, which I expect he wanted me to sign before he gave me the deed." In answer to a previous question, he said; "There was a paper there for me to sign, but they did not read it to me." And he had said in reply to an interrogatory before that, that there was a paper in the deed when it was handed to him folded. The agreement referred to is made an exhibit on the part of the complainants in this cause, and was produced on notice by the defendant, Thomas Reese. It appears to have been made cotemporaneously with the deed. The consideration in the deed was filled in after it was executed. A blank had been left for it. A like blank had been left in the agreement. The words "nine hundred" in each were evidently written by the same hand, and with the same ink, an ink different from that in which the rest of those instruments was written. It is clear from the testimony of Thomas Reese that the deed was part of the transaction in which the bond and warrant were given, and that he understood there was an expectation on Segraves' part that he would give a deed of defeasance, or some such instrument. Segraves testifies directly that Thomas Reese was uneasy about his money due from him and advised Segraves to secure him; that Segraves told him he

had nothing to do it with but this property; that they talked about his taking a mortgage on it, and Reese said it would not answer, on account of giving deeds for the plots; that then Reese proposed taking a deed for it, and promised in that case to take his pay as the plots were sold, and to reconvey the property when he should have been paid, and suggested that the rest of the creditors could not, under that arrangement, take the property away from Segraves. Segraves says he then gave Reese a deed of the property, and the latter said he would give him an article of agreement to shew that it was all right and that he would do as he promised. William Hayden, who was employed to draw the papers, testifies that he prepared the deed and agreement at Segraves' request and took them to the house where they lived; that he there read both in the presence of the father, Jacob Reese, since deceased, one of Thomas Reese's sons being also present; that Thomas Reese said in reference to signing the agreement, that he would like to wait a short time to have the papers examined to see that everything was all right before he signed the agreement. He adds, one of the party, which consisted of Thomas Reese, Charles Segraves, and Jacob Reese, asked if the signing of the agreement at that time would make any difference, and the witness told them it would not. He says he left the papers lying on the table, and he thinks Jacob Reese took them up and folded the deed and agreement together, and handed them to his father. According to Thomas Reese's testimony, the agreement was folded in the deed. Hayden says that a few days after the execution of the deed he had a conversation with Thomas Reese on the subject of the agreement, the purport of which was that he, Reese, thought there was some danger in signing the agreement, on account of the then situation of Segraves' affairs, his health, &c.; and, speaking in reference to the life Segraves was leading, Reese said he was fearful Segraves would become so involved and would run through this property, that there would be nothing left for the use of his wife and children; that he spoke of the situation in which Segraves'

wife was placed at that time, (she was an invalid,) and the likelihood of her continuing so, and said, so long as the property remained so, there would be something left for Segraves' wife's and children's support, and his too; that he, (Reese,) did not want to derive any benefit from it for himself or his family, all he wanted was his own money out of it, and afterwards it should be left for the benefit of Charles' wife and children, and himself too, if necessary. The statement in the answer, in regard to the agreement, is not only not sustained, but disproved. The answer alleges that Segraves proposed to sell to Thomas Reese the land in question for what it was reasonably worth, and that the latter being acquainted with the property, and in his judgment having concluded that it was worth $900, made Segraves an offer to purchase it for that sum, and after some negotiations on the subject that price was finally agreed upon between them, and the premises were sold to Thomas Reese for that sum accordingly. In his testimony Thomas Reese says that Hayden and Segraves came to him with the deed already signed by Segraves' wife; that Segraves set no price on the property; that Hayden went to work as he presumed to take the acknowledgment, and went into a room to write, and after he had written awhile cried out that there was no consideration stated in the deed, and stated there was $200 dower on the property; that then he told Hayden he would give Segraves $900 for the property, exclusive of the dower, and that then Segraves said it did not "make any odds" what he paid, that he, Segraves, set no price on it at all. He says he "did not know what to make of Segraves at the time," and he "thought it a very curious way for a man to do business;" that he thought Segraves "acted curious," and he "could not understand what he," Segraves, "meant." He testifies that he had no conversation with Segraves about the conveyance of the property at any time, before the latter and Hayden came with the deed already signed; that it was altogether a new thing to him.

This statement obviously does not sustain the answer, and

it goes very far to shew that the transaction was by no means such as Thomas Reese claims it to have been. The price fixed, according to the answer, was $900; according to Thomas Reese's testimony, it was $1100. It is shewn by a number of witnesses that the property was worth at that time from $2000 to $2500.

The character of the property was such as to render it very unlikely that such a sale, at such a price, would have been made by Segraves, if his circumstances were such as Thomas Reese insists they were. The income from it was considerable. It was the only cemetery in Phillipsburg. It had an increasing value. According to Reese, Segraves was not embarrassed by debts at the time of the conveyance. An effort was made by Thomas Reese to show that the complainant's allegations on that head, are unfounded in fact. It seems improbable, that if Segraves' pecuniary condition was as Thomas Reese alleges, he would have been willing to have sold such a piece of property in such a way, for so inadequate a price. In this connection, it may be remarked, that the reason which Hayden and Segraves allege was given for preferring the plan of conveying the property to Thomas Reese, by deed absolute on its face, to that of giving him a mortgage, is a probable one. The property was to be sold in small lots, from time to time, as purchasers should present themselves. A mortgage upon the property, if it would not prejudice the sale, would embarrass the conveyances. This difficulty would be avoided by the plan agreed upon. The testimony of Segraves and Hayden in regard to the transaction, is strongly corroborated, and that of Thomas Reese, on the other hand, discredited, by the conduct of Thomas Reese, in reference to the property after the conveyance to him. He permitted Segraves to continue to look after the property, as he had done before the conveyance. Segraves appeared to take and to have the same interest in it afterwards as before. Segraves expended money in improving it in various ways. He exercised rights of ownership over it, and, at least, up to 1861, Thomas Reese annually accounted

with him him for the proceeds of the property, whether from the sale of plots or graves, or hay produced on the part of the property not in use for burial purposes. Segraves alleges that he ceased to interest himself in the property, only after the refusal of Thomas Reese to reconvey the property to him, about the year 1862 or 1863. This action on the part of Reese is not sufficiently explained by the allegation that he entertained an intention of giving to Segraves' family the benefit of the property, after he had been paid his debt from its proceeds. Nor is the conduct of Segraves in the matter, accounted for by the supposition that his interest in the premises, and the avails of them, arose from his desire to secure the property, after payment of his debt, to his father-in-law, for his wife and children; for his alleged utter disregard of his family, and his obligations to them, is brought prominently forward in the testimony, on behalf of the defendant, Reese.

The action of the latter, in obtaining, on the 8th of October, 1863, from Peter Lerch, the person in charge of the cemetery, the book in which the account of the sales of lots and graves had been kept, from 1857 to that time, and retaining it in his possession from that time forward; substituting in its place another, although it was by no means full; producing it before the examiner in a mutilated condition, the leaves on which the memoranda and figures, ("cyphering and things," as Reese terms them,) made in their settlements, having been taken out while the book was so in Reese's custody, while he professes to be unable to account for the removal of those leaves, further than to say, that it had "been of interest, he supposes, to the man who took them out, or else he would not have taken them out;" the erasure of the last credit made by him on the bond, under date of March 19th, 1861, which erasure, though the bond has been kept by him, he does not account for, further than to deny that he himself made it; all these circumstances tend strongly to cast discredit on his statements.

The testimony of Hayden and Segraves is further corroborated by that of Peter Lerch, and his wife and daughter, in

reference to the statement made by Thomas Reese when he took the book away. When he asked Peter Lerch for it, he said he wanted it to settle with Segraves; that Segraves thought he wanted to cheat him, and he wanted to settle up with him ; that Segraves was making a great fuss about it, and thought he (Reese) was going to cheat him ; that he (Reese) had about got his money back, and that he would either convey the property to Segraves or his wife again. Lerch referred him, for the book, to his wife. To her, Reese said he wanted the book to make a final settlement with Segraves, and when he got all the money that was yet to be paid on the book, he would have his dues, and then Segraves could have the property back again; that his dues were $800; that Segraves was " blowing a great deal " that he wanted to cheat him out of the cemetery, but he did not want a cent more than his own. This witness says, that when Reese and Segraves made their annual settlements, the former would say, " now you have paid me so much, and you owe me so much more." She says she knew, and always knew, from the time of their first settlement, that the amount due Reese from Segraves was $800. Further, the fact that the bond given by Segraves to Reese was held as a valid and subsisting security against the former, from the time of the conveyance, is of itself, evidence of the true character of that conveyance. The answer alleges that the property was bought by him at the price of $900, of which $700 were to be credited on the bond, and the remainder left to answer the claims of dower.

But Thomas Reese testifies that he was to give $900, exclusive of the dower. Why then credit on the bond, only $700? The bond, according to his testimony, was paid by the sale of the property to him, and a balance left, due Segraves. He says, in his direct examination, " I told him (Hayden) then I would give him (Segraves) $900, and of course I was to pay the dowry." Again, when asked to state whether the dowry of $200 was to be paid out of the $900, or over and above the $900, he replied, " I was to give him

$900, and then pay the dowry besides, whatever it was; I was to give him $900 for his right in it." And again, " When I bought it, I thought I was giving him $1000, or near that, and he was making money on it." In his cross-examination, he said : " I told him (Hayden) I would pay Charley Segraves $900 for the lot, exclusive of the dowry, but then Hayden took it and put it on the bond—$700 paid on the bond, and $200 for the dowry ; that is. the way he took it, but I did not mean it that way." And again he said, " I calculated to give Charley Segraves $900 for his right in the deed." And again, " I told him (Hayden) I would give Charley Segraves $900 for the cemetery lot, clear of the dowry ; I mean to give him that." It appears, then, that the statement in the answer, on this head, is incorrect. If so, why was the bond held as a security at all ? for, as before remarked, it was paid off by the sale, and Reese had become Segraves' debtor.

The bond, when produced, bears endorsements besides that which acknowledges the receipt of the $700, in the hand-writing of the defendant, Reese, two of which are signed by him. The first is dated January 14th, 1858, and is for $52.20, interest for one year, and $54.29 principal. It will be perceived that Reese acknowledges the receipt on the 14th of January, 1858, one year after the date of the deed, of $52.20, the interest for one year at six per cent. on the whole amount of the bond, $870.33. On the 14th day of July, 1859, he acknowledges the receipt of $73.08, interest for one year and six months. This is the interest on the balance of the whole amount of the bond, after deducting the payment of $54.29, made on account of the principal, on the 14th day of January, 1858. On the same day he acknowledges the receipt of $201.45, on account of the principal of the bond. On the 19th day of March, 1861, he endorsed on the bond a receipt signed by him for $61.45, interest, and $299.37 of principal. This last endorsement is erased with ink. The defendant, Thomas Reese, however, says he does not know who erased it. It appears, therefore, by these

endorsements, that he received, from the time of the conveyance to him of the cemetery property, interest on the bond and payments of principal, without regard to the credit made upon it in respect of the alleged consideration of that conveyance.

The conclusion is inevitable that that conveyance was not made as he insists, as an absolute conveyance to him, but was intended for his security merely, and he so understood it. The relation of debtor and creditor, in respect to the money which formed the alleged consideration of the conveyance, still subsisted. This, of itself, determines the character of the conveyance. There is evidence that Thomas Reese's debt was fully paid when the complainants purchased the property. In his answer he says that he has not received from the property a sum equal to the amount of the bond and interest thereon, and the amount due on the notes given for the dower, with interest thereon, but it seems very clear that he has received an amount equal to the amount of the bond and interest thereon, (which is all he is entitled to,) over and above all the payments he specifically sets out. But inasmuch as he claims to have made payments, of which, he says in his answer, he has not kept a full and exact account, and which he has not set forth in his answer, a reference will be ordered to ascertain whether he has received from the premises, over and above all lawful payments and allowances, an amount of money equal to the amount of principal and interest of the bond.

The complainants are entitled to a conveyance of so much of the premises as have not been conveyed to bona fide purchasers for valuable consideration, without notice of their claim to the property, on paying the balance, if any, which may appear to be due on the mortgage.

A decree will be made accordingly. They are entitled to costs.